IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2022

## STATE OF TENNESSEE v. DOMINIQUE JAMAL NICHOLS

**Appeal from the Circuit Court for Tipton County**
No. 9936    Joe H. Walker, III, Judge

_____

### No. W2021-00792-CCA-R3-CD
_____

The Defendant-Appellant, Dominique Jamal Nichols, was convicted by a Tipton County Circuit Court jury of two counts of possession of a firearm by a convicted felon, one count of evading arrest, and two counts of driving on a suspended license. See Tenn. Code Ann. §§ 39-17-1307(b)(1)(A) (possession of a firearm by a convicted felon); 39-16-603 (evading arrest); 55-50-504 (driving on a suspended license). The trial court imposed concurrent sentences of 12 years for each of the firearm convictions, 11 months and 29 days for the evading arrest conviction, and 6 months for each driving on a suspended license conviction, for a total effective sentence of 12 years to be served in the Tennessee Department of Correction. On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress "the stop and subsequent seizure of [the Defendant]'s vehicle[,]" and (2) the evidence was insufficient to support his convictions of possession of a firearm by a convicted felon. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the Defendant-Appellant, Dominique Jamal Nichols.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and W. Erik Haas, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On July 8, 2019, the Tipton County Grand Jury returned a six-count indictment charging the Defendant with two counts of possession of a firearm by a convicted felon, one count of theft of property under $1,000, one count of evading arrest, and two counts of driving on a suspended license. All but one of the driving on a suspended license charges stemmed from the Defendant's traffic stop and subsequent arrest following his failure to yield to a Tipton County Sheriff's Office ("TCSO") patrol car before proceeding through a tunnel. During the search of the Defendant's vehicle, the deputies located alcohol in an open cup, marijuana, and two firearms, one of which had been reported stolen. The remaining driving on a suspended license count stemmed from a traffic stop conducted on December 10, 2018, by TCSO Deputy Amy Brooks.

**Suppression Hearing.** On May 15, 2020, the Defendant filed a motion to suppress "evidence seized as the result of a warrantless search by law enforcement officials after the Defendant was illegally detained" during the December 31, 2018 traffic stop. On June 11, 2020, the trial court held a hearing on the motion.

At the suppression hearing, Christopher Martin testified that he had worked with the TCSO for six years and that he had been a deputy for four years. At approximately 11:31 p.m. on December 31, 2018, Deputy Martin was driving his patrol car southbound on College Street. Because it was the end of his shift, he and Deputy Matthew Lawler, whom he was training, were returning to the sheriff's office. As they came down a crest from the northbound side and approached a narrow underpass at Mill Street, Deputy Martin saw a vehicle approach the south entrance of the tunnel. It was dark, but Deputy Martin could see the other vehicle due to its headlights. "On the southbound side [of College Street] heading north" was a "yield to oncoming traffic sign." Deputy Martin, who was driving northbound and had the right-of-way, drove into the tunnel. (II, 7-8) The driver of the other vehicle "did not yield until [he] made it to the entrance of the tunnel" and "stopped at the entrance on the southbound side, which left very minimal room for [Deputy Martin] to maneuver around the vehicle without hitting the vehicle or the wall on the side." To avoid a collision, Deputy Martin "had to slow [his] speeds considerably and take extra caution than [he] normally would in that intersection to keep from hitting the car [or] hitting the side wall." Deputy Martin cleared the intersection, and the vehicle continued through the tunnel.

At that point, Deputy Martin turned around and stopped the vehicle, a black Chevrolet, for failure to yield to oncoming traffic. The stop occurred less than a quarter of a mile from the tunnel. Deputy Martin approached the Defendant's vehicle on the driver's side, and Deputy Lawler approached the Defendant's vehicle on the passenger's side. When he got to the driver's side window, Deputy Martin saw that the driver, the Defendant, was the only person in the vehicle. Deputy Martin noticed that the passenger's side window was "partially down" and that the driver's side window was "all the way down," and he

- 2 -

"smell[ed] a strong odor of marijuana coming from the passenger compartment of the vehicle."

Deputy Martin asked if the Defendant realized he was supposed to yield at the intersection, which was "basically telling him why [Deputy Martin] was stopping him." Deputy Martin did not recall the Defendant's response. Deputy Martin "went to the smell of raw marijuana in the car" and asked the Defendant if he had "anything in the car." The Defendant denied having marijuana in the vehicle and "stuck his tennis shoes out the window" in an "attempt to show [Deputy Martin] there was nothing in them[.]" Deputy Martin told the Defendant that if he only had "a little bit" of marijuana, he could "work with" him but that if the Defendant made Deputy Martin search for the marijuana, he would have to bring charges against the Defendant for marijuana possession.

After conversing with the Defendant, Deputy Martin asked the Defendant to exit the vehicle. Deputy Martin explained that while he had probable cause to search the vehicle because he and Deputy Lawler had smelled marijuana in the vehicle, Deputy Martin nevertheless obtained the Defendant's consent to search the vehicle. Once the Defendant was out of the vehicle, Deputy Martin "patted him down to check for weapons" and "walked him to [the] patrol car and had him turn around and sit on [the] push bumper." Deputy Lawler monitored the Defendant while Deputy Martin searched the Defendant's vehicle.

As Deputy Martin was searching the vehicle, Deputies Coy Ballard and Garrett Kelly arrived at the scene to assist with the traffic stop. After Deputy Martin found marijuana, the Defendant "fled on foot." Deputy Martin remained with the vehicle while the other officers pursued the Defendant, who was ultimately taken into custody on Carr Street. Thereafter, additional deputies arrived to assist with the stop.

During his search of the vehicle, Deputy Martin found marijuana in the console, a cup in the "console cup holder" containing an alcoholic beverage, a bottle of Smirnoff vodka in the backseat behind the console, and a bottle of Paul Masson brandy in the trunk. Deputy Kelly, who was assisting in the search, found in the backseat of the vehicle a backpack which contained two firearms, one of which, a "Taurus 9mm," had been reported "stolen out of Memphis." Deputy Martin verified the identity of the stolen gun with its serial number. Deputy Martin performed a "check" and learned that the Defendant's driver's license was suspended and that he had "four active revocations or suspensions at the time."

Deputy Martin identified photographs of the items collected from the Defendant's vehicle and of the tunnel on College Street. Deputy Martin described the College Street tunnel as "not a straight 90[-]degree tunnel. It's actually an angled tunnel." He elaborated

that "even though you stop at the entrance of the southbound side, you're still basically in the tunnel . . . for the southbound traffic." Deputy Martin identified the "recording from [his] dash cam the night of the incident[,]" which he explained showed "30 seconds prior to [the] stop and the entire stop."

On cross-examination, Deputy Martin clarified that the yield sign for the College Street tunnel was "on the south side" but was "for the northbound traffic." The sign was located "[j]ust before the intersection at South College and Mill Street." He said that the only other "traffic control devices" in the area were "cautionary signs. There's one right at the entrance of the tunnel that would be long, narrow, yellow and black caution sign." He agreed that nothing was painted on the street, such as a white line, near the yield sign. He further agreed that he had stopped the Defendant for failure to yield the right of way and that, based upon the statute, "vehicles are not necessarily required to stop at a yield sign[.]"

Deputy Martin testified that the Defendant's vehicle "did not enter the tunnel, but it did not yield to the traffic to make it a clear pathway without causing [an] obstruction." Deputy Martin "slowed to a very slow speed" and took "extreme measures[,]" such as "sit[ting] all the way up in [his] seat, watch[ing his] mirrors, mak[ing] sure [his] mirrors didn't hit [the Defendant's] mirrors or scrape the outside wall," in order to make it through the tunnel without hitting the Defendant's vehicle or the wall. [Id.]. Deputy Martin agreed that he had a duty of due care and was "supposed to . . . maintain [his] vehicle at a safe speed" and "[m]aintain a safe lookout[.]" He agreed that he "technically" had "room to get by" the Defendant's vehicle. Deputy Martin also agreed that "the way where [the Defendant] was stopped" was the Defendant's only traffic infraction.

Deputy Martin explained that when he "crested the hill" driving towards the tunnel, the Defendant "was still coming towards the intersection[.]" The distance from the top of the hill to the entrance of the tunnel was "25 to 30 yards[.]" Deputy Martin opined that from the south side of the tunnel, it would be "very easy" to see a vehicle as it "crest[ed] the hill" at night because "you can see the headlights coming, not only through the tunnel but over the railroad tracks." Additionally, street lights were on the north side of the tunnel. Deputy Martin was traveling 30 miles per hour, which was the speed limit, as he approached the tunnel and traveled from the top of the hill to the tunnel in "[a]pproximately three or four seconds." Deputy Martin acknowledged that it was at night and that it had recently stopped raining. Regardless, he opined that if the Defendant had been "abiding by the yield sign and looking to make sure that it was safe, he would already be at a slow speed to where he should be able to stop immediately" and yield the right of way to Deputy Martin. Deputy Martin noted that the Defendant "wasn't to the yield sign when I saw his [head]lights, so I know he saw my [head]lights before he made it to the yield sign."

Deputy Martin reiterated that he "noticed a very strong odor of marijuana" when he "got up to the window to make contact with the driver." The marijuana he recovered from the Defendant's vehicle was ".07 grams," which he opined was a "[v]ery small amount." The marijuana was not sent "off to the lab" because "they will not test that small of an amount." Deputy Martin did not investigate whether the Defendant was "intoxicated or impaired" because "he fled the scene[,]" and the police had "other charges that were more important than the DUI or the intoxicated driving."

Deputy Martin found the marijuana "almost immediately" after starting the search, and the backpack was found afterward. Deputy Martin was unsure whether the backpack was open or closed when Deputy Kelly found it. The Defendant was "not under arrest at that time"; however, he was not "free to go" because he was "still detained for the investigation." Deputy Martin did not recall exactly what the Defendant said when he gave his consent to search the vehicle. However, Deputy Martin recalled that he told the Defendant that he had smelled marijuana and asked, "[D]o you care if I take a look, and he told me no." He reiterated that although he did not need the Defendant's consent to search, he was "trying to be courteous." On redirect examination, Deputy Martin testified that the vehicle was registered to the Defendant.

No further witnesses were called, but the parties submitted the video of the traffic stop as an exhibit for the trial court's review. The trial court said that it would review the video before issuing a ruling. On June 15, 2020, the trial court denied the motion to suppress by written order. In the order, the trial court accredited Deputy Martin's "uncontroverted testimony" that the deputies had "reasonable cause" to stop the Defendant's vehicle and that the Defendant consented to the search of his vehicle, noting that he "departed rapidly" after the marijuana was found. The case proceeded to trial on May 3, 2021.

**Trial.** At trial, Deputy Martin's testimony was largely consistent with his testimony at the suppression hearing. However, he also testified that the Defendant had been convicted of aggravated assault, a felony, in Shelby County.

Deputy Matt Lawler testified that late on December 31, 2018, he and Deputy Martin were returning to the office, driving southbound toward a tunnel on South College Street. He said, "It's a very narrow tunnel. It's made for one car at a time. There's a yield sign, if you're coming northbound." The Defendant's vehicle, which was driving northbound while the deputies "were in the tunnel did not yield, so we had to very slowly go past [him]." The Defendant's car stopped. After the deputies' vehicle made it through the tunnel, they turned around and stopped the Defendant's vehicle.

Deputy Lawler approached the passenger's side but did not notice anything because the passenger's side windows "were rolled up." The Defendant, who was the driver, was the only occupant of the vehicle. At some point, the Defendant exited the vehicle and was "patted down for weapons for officer safety." Thereafter, Deputy Lawler "stood with him at the front of the [patrol] vehicle."

While the video of the traffic stop was played for the jury, Deputy Lawler explained that the Defendant bent down to tie his shoelaces multiple times while they stood at the patrol vehicle. Deputy Lawler did not smell anything from the vehicle when he first approached but "could smell the odor of marijuana" when he "came around" to the driver's side while Deputy Martin was "patting [the Defendant] down[.]" Deputy Lawler "slipped in the mud" while chasing the Defendant after he fled the scene and "jumped a fence," but Deputy Ballard "clear[ed] the fence" and eventually "found [the Defendant] in a wooded area[.]"

Lance Midgett testified that he lived in Memphis and that in May 2018, he reported to Memphis police that his "Taurus nine-millimeter" firearm had been stolen. He could not recall how long the firearm was missing before he reported it stolen. Mercedes Hughes, the mother of Midgett's child, showed Midgett a photograph on Facebook that depicted the Defendant "around some guns," and Midgett recognized one of the guns as the one that had been stolen from him. Midgett said that he did not know the Defendant but that he "was familiar with him." He said he knew it was the Defendant in the photograph because Hughes "told [him] who it was." The Defendant's name was at the top of the "Facebook post," and the photograph was marked with the time "8:05 p.m." After seeing the photograph, Midgett reported the gun stolen because he "wanted to get the gun out of [his] name[] if somebody else had it." Midgett denied giving the Defendant permission to possess his firearm and estimated its value as $600. Midgett said that the "Taurus nine-millimeter" the police recovered from the Defendant's vehicle looked like the one that had been stolen from him. The State submitted the Facebook photograph as an exhibit.

On cross-examination, Midgett agreed that Hughes and the Defendant had formerly been "boyfriend and girlfriend[.]" Midgett did not know when the Facebook photograph depicting the Defendant with the guns was taken. He explained that he knew the firearm in the Facebook photograph was his because "[i]t looked like it, and [Hughes] had told [Midgett] that [the Defendant] had it."

TCSO Deputy Amy Brooks testified that on December 10, 2018, she was working as a patrol officer with the Covington Police Department. She stopped the Defendant's black, four-door, Chevrolet Malibu after witnessing the Defendant, who was the driver, "fail to use the signal turn to turn right[.]" Deputy Brooks approached the Defendant's vehicle and asked for his driver's license, but he "provided a[n] identification[-]only ID."

Deputy Brooks "ran the ID through dispatch" and learned that the Defendant's driver's license had been suspended. Deputy Brooks identified a certified copy of the Defendant's driving history, which reflected "several" entries indicating that his driver's license had been suspended prior to December 10, 2018.

Following the close of the State's proof, the Defendant moved for a judgment of acquittal, asserting that the State failed to prove that the Defendant "was actually under arrest at the time that he decided to leave the scene." The State responded that the issue of whether the Defendant knew that the deputies were attempting to arrest him would be for the jury to decide. The trial court agreed and subsequently denied the motion.

The Defendant chose to testify. He acknowledged that he had a prior felony conviction in Shelby County and that he was driving his vehicle at the time of the traffic stop. The Defendant testified that he knew Hughes because she was his son's mother and that they had an "[o]ff and on" relationship. He denied knowing Midgett.

On December 31, 2018, the Defendant "got off work" at 2:00 p.m. and around 6:00 or 7:00 p.m., he picked up Hughes and his son to take them to a family gathering at his mother's house. They stayed at the gathering until "about 9:30, 9:45" when the Defendant took Hughes and his son home.

Later that night around 11:30 p.m., the Defendant approached the tunnel at College Street. He said that he had "been through there plenty of times" and that he knew he had "to yield/stop." The Defendant saw the patrol car's headlights approaching from the opposite side of the tunnel and "stopped . . . before [he] was in the tunnel." The Defendant said, "It was raining outside, so you can't just stop immediately, it's going to slide, and I just slowed up, come to a slow stop that give him the right [of] way to come through, and I proceeded through the tunnel."

Thereafter, Deputy Martin stopped the Defendant. The Defendant explained that at the time of the stop, he had his shoes off because he had been wearing "steel-toed" shoes for "at least 12 hours a day." When Deputy Martin first approached the Defendant's vehicle, he asked the Defendant to open the windows because they "weren't cracked." After the Defendant opened the window, Deputy Martin told him that his window "tint was too dark" and that he "smelled weed in the car." The Defendant responded, "I just got off work. I ain't smoked. I'm just – I'm on my way home." Deputy Martin requested the Defendant's driver's license, and the Defendant gave the deputy his "ID." Deputy Martin had the Defendant exit the vehicle and stand in front of the patrol car. The Defendant testified that he was "fearful" and "paranoid" because he had previously "been shot from the back[,]" and the deputies were "coming from . . . [his] back[.]" He was never told that he was under arrest or that he was being detained. He fled the scene because he thought

the deputies were "going to do something to [him]." He denied that he was "being detained" at the time he fled and stated that he had just been "asked to step out of [his] vehicle." The Defendant denied that he knew the backpack was in his vehicle or that he knew its contents. He stated that the deputies did not detain him until after he escaped and reemerged from the "other side of the tree[s.]"

The Defendant acknowledged that he had a Facebook account but denied that the photograph of him with the firearms came from his Facebook account. He explained that the account with the photograph spelled his first name "Domonique," which was not the correct way to spell his name. Nevertheless, the Defendant conceded that he was the person in the photograph and that the photograph had been taken in his apartment.

The Defendant acknowledged that he had two aggravated assault convictions in Shelby County, a felony theft conviction, and another theft conviction in Shelby County. On the day of the traffic stop, Hughes came to the Defendant's car with "at least about two, three bags," including their son's diaper bag. The Defendant said that he had not been concerned about the contents of the bags. The Defendant denied that the guns were his and denied knowing that the firearms were in his vehicle. He noted that after the photograph was taken, he told Hughes to "get [the guns] away from me, just being honest. Told her to get away from me."

On cross-examination, the Defendant denied that the Facebook photograph showed two separate guns beside him, maintaining that "the first figure at the front" was "a remote." Nevertheless, he acknowledged that Midgett's stolen gun was found in a bag in the back of his car approximately seven months after Midgett reported the gun stolen; however, he did not know how the backpack containing the firearms was placed inside his vehicle. The Defendant surmised that Hughes must have taken the firearm from Midgett. He agreed that Midgett and Hughes filed an affidavit of complaint with the Memphis Police Department reporting the firearm was stolen and that the affidavit provided the Defendant had taken Hughes's car, the gun had been in Hughes's car, but that the gun was not inside Hughes's car when the Defendant returned it. The Defendant did not know the gun was in Hughes's car. The Defendant also denied ownership of the second firearm in the backpack and stated that he did not know to whom the gun belonged.

The Defendant testified that he was six feet and four inches tall but denied that he could "easily reach to the back [-] passenger floorboard" where the backpack was found because he was driving and had to "maintain [his] vision on the road." He surmised that the bag must have belonged to Hughes and asserted that he had "no knowledge of the guns." The Defendant did not remember what firearm he used in the incident underlying his previous aggravated assault convictions. The Defendant testified that he had thought he was being stopped by "security cars," not law enforcement, because he had never "had

a run-in" with TCSO, only with the Covington Police Department, and the deputies were wearing khaki uniforms. However, he knew the deputies who apprehended him were "real police" because he heard the sirens and the radio activity.

The Defendant agreed that his driver's license was suspended on December 10, 2018, when he was stopped by Deputy Brooks and on December 31, 2018, when he was stopped by Deputy Martin. The Defendant estimated that the Facebook photograph was taken in "January or February" of 2018, at which time he was already "a convicted felon of violent crimes out of Shelby County." He insisted that the Facebook photograph did not show him "with a gun" but instead showed him with the firearm "[p]ossibly near [him]." The Defendant elaborated that he was shot by an "individual" in April 2013 and still did not "let too many people behind [him,]" noting that "anybody c[ould] do [him] harm." He agreed that he pled guilty to "[t]heft of property over 500" in Shelby County in 2014 but denied that the judgment sheet presented by the State reflected his guilty plea because although it provided his name and date of birth, it had a different social security number. The Defendant reiterated that Hughes was "the last person to [his] knowledge having those guns[.]"

On redirect examination, the Defendant agreed that Hughes took the Facebook photograph. The Defendant said Hughes lived with him, but she also had a relationship with Midgett and had a child with him. On December 31, 2018, Hughes entered the Defendant's vehicle with several bags; the Defendant did not ensure she had taken all of the bags when he "dropped her off."

Following the conclusion of the proof, the Defendant renewed his motion for judgment of acquittal, which the trial court again denied, reasoning that there was "still a[n] issue for a decision by the jury." The jury acquitted the Defendant of the theft charge but otherwise found him guilty on all counts. The trial court imposed concurrent sentences of 12 years for each of the firearm convictions, 11 months and 29 days for the evading arrest conviction, and 6 months for each driving on a suspended license conviction, for a total effective sentence of 12 years to be served in the Tennessee Department of Correction.

The Defendant filed a timely "Motion for Judgment of Acquittal or in the Alternative Motion for New Trial" on June 15, 2021, asserting, among other things, that the trial court erred in denying the Defendant's motion to suppress and that the evidence was insufficient to sustain the verdicts. The trial court denied the motion for new trial on July 8, 2021, and this timely appeal followed.

## ANALYSIS

On appeal, the Defendant contends that the trial court erred in denying his motion to suppress due to the illegal search and seizure of the Defendant and his vehicle and that the evidence was not sufficient to sustain his convictions of being a convicted felon in possession of a firearm. The State responds that the traffic stop was supported by the "commission of a traffic offense" and that the evidence was sufficient to sustain the firearms convictions. After careful review, we agree with the State.

**I. Motion to Suppress.** The Defendant contends on appeal that the trial court erred in denying his motion to suppress "the stop and subsequent search of [the Defendant's] vehicle," specifically asserting that the TCSO deputies did not have probable cause to seize the Defendant or search his vehicle because the "dashcam video introduced into evidence . . . shows that [the Defendant] clearly yielded." The State responds that Deputy Martin's stop of the Defendant's vehicle was "valid" because he "did not yield early enough to exercise the sort of caution" required by Tennessee Code Annotated section 55-8-130(c)(1), the failure to yield statute cited by Deputy Martin.

When this court reviews suppression issues, the prevailing party in the trial court "'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "'Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" State v. Hawkins, 519 S.W.3d 1, 32 (Tenn. 2017) (quoting Odom, 928 S.W.2d at 23). A trial court's findings of fact in a suppression hearing will be upheld, unless the evidence preponderates against them. Id. (citing State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014)). However, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. Id. at 32-33 (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider the entire record, including not only the proof offered at the suppression hearing but also the evidence presented at trial. State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012). The Defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7. The Tennessee Supreme Court has held that Tennessee's search and seizure provision "'is identical in intent and purpose with the Fourth Amendment.'" State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016) (quoting Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). "[U]nder both the federal and state

constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)).

One of these narrow exceptions is when an officer has probable cause or reasonable suspicion to believe that a traffic violation has occurred when he or she initiates a traffic stop. State v. Brotherton, 323 S.W.3d 866, 870 (Tenn. 2010) (citing Whren v. United States, 517 U.S. 806, 810 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Vineyard, 958 S.W.2d 730, 736 (Tenn. 1997)); see State v. Watson, 354 S.W.3d 324, 329 (Tenn. Crim. App. 2011). Here, the Defendant was clearly seized when Deputy Martin turned on his patrol car's blue lights to stop the Defendant's vehicle. See State v. Davis, 484 S.W.3d 138, 143 (Tenn. 2016); State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008). Accordingly, we must determine whether the officer had probable cause or reasonable suspicion to believe that a traffic violation had occurred when he initiated the stop of the Defendant's vehicle. See Brotherton, 323 S.W.3d at 870; Vineyard, 958 S.W.2d at 734; Whren, 517 U.S. at 810.

The Tennessee Supreme Court has recognized that it is impossible to precisely articulate what probable cause means. Smith, 484 S.W.3d at 400. Instead, probable cause is a "'practical, nontechnical concept.'" Id. (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989)). "'[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt.'" Davis, 484 S.W.3d at 143-44 (quoting State v. Bishop, 431 S.W.3d 22, 41 (Tenn. 2014)). "'[T]he constitutional validity of the [seizure] does not depend on whether the suspect actually committed any crime,' and 'it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with or whether a person is later acquitted of the crime for which she or he was arrested.'" Id. at 144 (alteration in original) (quoting Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citations omitted)). "[P]robable cause exists when 'at the time of the [seizure], the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" State v. Dotson, 450 S.W.3d 1, 50 (Tenn. 2014) (quoting Echols, 382 S.W.3d at 277-78); see Smith, 484 S.W.3d at 400.

"'It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" Davis, 484 S.W.3d at 143 (quoting United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996)); see State v. Berrios, 235 S.W.3d 99, 105 (Tenn.

- 11 -

2007) ("As a general rule, if the police have probable cause to believe a traffic violation has occurred, the stop is constitutionally reasonable."); Vineyard, 958 S.W.2d at 736 (holding that officers' observation of the defendant's violations of traffic laws created probable cause justifying the stop). Our supreme court has explained that "[m]any of our traffic statutes create offenses which render it simple for an officer to determine whether a motorist has committed a violation." Smith, 484 S.W.3d at 400. Examples of such traffic offenses are running a stop sign, exceeding the speed limit, or running a red light. Id. at 401 (citations omitted). Upon witnessing any of the foregoing actions, an officer may have probable cause to stop a motorist. Id. However, certain "driving conduct . . . may or may not constitute a traffic offense" and may require an officer to investigate further to discern whether an offense is being committed. Id. Examples of such questionable behavior are weaving within the motorist's lane of travel, driving below the speed limit, or engaging in prolonged delays at four-way-stop intersections in the absence of other traffic, which could lead an officer to suspect the motorist may be intoxicated. Id. Even if the officer "lacks probable cause to seize a motorist, he nevertheless may legitimately initiate a brief, investigatory traffic stop if he possesses a "'reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed.'" Id. (quoting State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000)). While a police officer must have "probable cause to stop a motorist in order to issue a citation, reasonable suspicion stops are *investigatory* in nature." Id. Deputy Martin stopped the Defendant for failure to yield, an offense for which no further investigation was required. Accordingly, Deputy Martin must have had probable cause to stop the Defendant.

Deputy Martin stopped the Defendant for violating Tennessee Code Annotated section 55-8-130(c)(1), which provides that

> [t]he driver of a vehicle who is faced with a yield sign at the entrance to a through highway, drive, or other public roadway is not necessarily required to stop, but is required to exercise caution in entering the highway, drive, or other roadway and to yield the right-of-way to other vehicles which have entered the intersection from the highway, drive, or other roadway, or which are approaching so closely on the highway, drive, or other roadway as to constitute an immediate hazard, and the driver having so yielded may proceed when the way is clear.

Tenn. Code Ann. § 55-8-130(c)(1). "Right-of-way" is defined as "the privilege of the immediate use of the roadway[.]" Id. § 55-8-101(66); see Black's Law Dictionary 1440 (9th ed. 2009) (defining "right-of-way" as "[t]he right to take precedence in traffic"). "Right-of-way" is also defined by Tennessee Pattern Jury Instructions ("TPI") as "the privilege given by law to one person over another for the immediate use of the same space on a roadway[,]" though "a person who has the right of way is not excused from using

- 12 -

reasonable care to avoid an accident."  Tenn. Pract. Pattern Jury Instr. T.P.I.– Civil 5.02.
Though not explicitly defined by statute or case law, the TPI defines "immediate hazard"
as existing "whenever a reasonably careful driver should realize that another vehicle, if
continued in the same direction at the same speed, would probably collide with the driver's
vehicle if the driver entered the intersection."  Tenn. Pract. Pattern Jury Instr. T.P.I.–Civil
5.04.[1]  The comments to TPI 5.04 provide that the definition of "immediate hazard" was
derived from "similar words" in Smith v. Murphy, 346 S.W.2d 276 (Tenn. Ct. App. 1960).
Smith held "that the duty to yield begins 'when it would appear to a person of ordinary
prudence, in the position of the driver [with the duty to yield] that if the two [vehicles]
continued on their respective courses, at the same rate of speed, a collision would be likely
to occur."  346 S.W.2d at 278-79 (citation and internal quotation marks omitted).

The trial court found:

> Traffic moving south had the right of way, with north bound [traffic] required
> to yield the right-of-way.  There is a yield sign for north bound traffic.  The
> tunnel is not wide enough for two vehicles to safely pass.  As the officer
> approached and entered the tunnel, the defendant's vehicle did not stop at the
> yield sign, but came to the entrance of the tunnel and took up a part of the
> roadway, so that the officer had to maneuver the patrol car to avoid an
> accident.

The court noted that it was "familiar with the location since the tunnel is located about a
hundred yards from the courthouse and used often."  The trial court also found that
photographic evidence revealed that "[p]ast the yield sign and at the mouth of the tunnel is
a road on the right which comes into College Street, and the yield should be made before
that road and not blocking that roadway and the mouth of the tunnel."  The trial court
adopted the legal analysis promulgated by the State in its "Response to the Defendant's
Motion to Suppress," which provided that by having the right-of-way, the deputies "had
the exclusive and immediate use of the roadway."  Therefore, the deputies "should have
been able to proceed through the tunnel without altering their speed and should have been
able to use the full width of the tunnel without the threat of a collision, but [the Defendant]
blocked a portion of the roadway with his car," which resulted in his failure to yield.  The
trial court concluded that Deputy Martin had "reasonable cause to issue a citation for a
traffic violation."

---

[1] A leading law dictionary defines "hazard" as "[d]anger or peril; esp[ecially] a contributing factor
to a peril."  Black's Law Dictionary 786 (9th ed. 2009).  An "imminent hazard" is "[a]n immediate danger."
Id.  Immediate is defined as "[o]ccurring without delay; instant."  Id. at 816.

- 13 -

Having reviewed the record on appeal in its entirety, we conclude that the evidence does not preponderate against the trial court's finding that Deputy Martin's stop of the Defendant was supported by probable cause that the Defendant violated Tennessee Code Annotated section 55-8-130(c)(1). In our view, the dashcam recording of the alleged failure to yield and subsequent traffic stop supports Officer Martin's testimony that the Defendant failed to yield the right of the way. As the trial court observed, the video shows that the tunnel was not wide enough to accommodate two vehicles at the same time. The video also shows that Deputy Martin approached the tunnel and that the headlights of the Defendant's vehicle were clearly visible on the other end of the tunnel. Although Deputy Martin's vehicle had the right-of-way, the video shows that the wheels of the Defendant's vehicle did not stop until Deputy Martin's vehicle was nearly even with the Defendant's vehicle. The video further shows that Deputy Martin had to markedly decrease his speed and drive close to the tunnel wall to safely pass the Defendant's vehicle.

We acknowledge that Tennessee Code Annotated section 55-8-130(c)(1) (emphasis added) provides that the yielding vehicle "is not <u>necessarily</u> required to stop" but is "required to exercise caution in entering" the intersection and "to yield the right-of-way to other vehicles which have entered the intersection . . . as to constitute an immediate hazard." While the Defendant may not have been required to stop his vehicle, he was required to not place his vehicle in such a manner as to cause an "immediate hazard." As we noted, <u>Smith</u>, which was the precursor to TPI 5.04, explained "that the duty to yield begins 'when it would appear to a person of ordinary prudence, in the position of the driver [with the duty to yield] that if the two [vehicles] continued on their respective courses, at the same rate of speed, a collision would be likely to occur.'" 346 S.W.2d at 278-79 (citation and internal quotation marks omitted). The Defendant's vehicle was in such a position that, had Deputy Martin not exercised extreme caution and maneuvered his vehicle close to the wall of the tunnel, the vehicles would have collided, which is the very scenario the failure to yield statute seeks to avert. [2]

The Defendant further contends that Deputy Martin did not have probable cause to search his vehicle. He maintains that, given the small amount of marijuana that was found in the vehicle, Deputy Martin's testimony that he could smell marijuana was questionable.

---

[2] The Defendant was also indicted in the District Court for the Western District of Tennessee for offenses stemming from the same facts and filed a similar motion to suppress the evidence found as a result of the illegal stop and seizure. The district court granted the motion, concluding that Deputy Martin did not have probable cause to stop the Defendant. We note that the district court placed the onus on Deputy Martin, the driver with the right-of-way, to exercise "reasonable care to avoid an accident." (Order, 10) However, in our view, this does not relieve the Defendant of his obligation to obey the traffic laws simply because Deputy Martin was able to exercise his duty of due care as a driver to avoid a collision. Accordingly, as we are not bound by federal district court jurisdiction, we decline to adopt its analysis as suggested by the Defendant.

The Defendant also maintains that although he consented to the search, he did so under undue coercion from the [d]eputy" and notes that "no written consent form [was] provided to the contrary." We note that the trial court granted the motion to suppress based upon the Defendant's consent to search. Therefore, we will examine the issue to determine whether the Defendant's consent was valid.

Because warrants protect a defendant's constitutional rights against unreasonable searches, law enforcement officials must generally obtain a warrant prior to conducting a search. Kentucky v. King, 563 U.S. 452, 459 (2011); see State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) ("[A]s a general matter, law enforcement officials cannot conduct a search without having first obtained a valid warrant."). When evidence is seized following a warrantless search of a vehicle, the State must prove that the search was conducted pursuant to one of the exceptions to the warrant requirement. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002). One such exception is a search conducted pursuant to consent. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973)); Bartram, 925 S.W.2d at 230.)

The State has the burden of establishing that an individual's "'consent was, in fact, freely and voluntarily given.'" State v. Reynolds, 504 S.W.3d 283, 306 (Tenn. 2016) (quoting Schneckloth, 412 U.S. at 222). To be valid, consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Ingram, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting Berrios, 235 S.W.3d at 109). A defendant's will cannot be overborne and his act of consenting must be "the product of an essentially free and unconstrained choice." State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005). Whether a person voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances. Berrios, 235 S.W.3d at 109 (citing Schneckloth, 412 U.S. at 227; Cox, 171 S.W.3d at 184, 186).

Factors to consider in determining whether an individual's consent is voluntary include the time and place of the encounter, whether the encounter was in a public or secluded place, the number of officers involved, the degree of hostility during the incident, whether weapons were displayed, whether consent was requested, and whether the consenter initiated contact with the police. Cox, 171 S.W.3d at 185. In addition, an individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel" are relevant in determining whether consent is voluntary. Id. (internal quotation marks and citation omitted). Finally, an individual's "'[k]nowledge of the right to refuse consent'" is also a factor in determining the voluntariness of consent. Id. (quoting Schneckloth, 412 U.S. at 235-47).

In denying the motion to suppress, the trial court cited Deputy Martin's "uncontroverted" testimony that the Defendant consented to the search. The Defendant presented no proof at the suppression hearing that his will was overborne or that his decision to consent to search was not freely made. Instead, the proof reflected that Deputy Martin informed the Defendant that he had smelled an odor of marijuana coming from the Defendant's car and requested consent to search, which the Defendant gave. The proof does not preponderate against the trial court's ruling.

**II. Sufficiency of the Evidence.** The Defendant contends that the evidence was not sufficient to sustain his convictions of possession of a firearm by a convicted felon because he did not have the mens rea to commit the crimes.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a

felony involving the use or attempted use of force, violence, or a deadly weapon." There is no dispute that the Defendant's prior convictions for aggravated assault qualify as a felony conviction involving the use of violence and force. Tenn. Code Ann. § 39-17-1301(3). In Tennessee, possession may be either actual or constructive. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). A person constructively possesses contraband when he or she has "the power and intention at a given time to exercise dominion and control over [the contraband] either directly or through others." Id. at 903 (quoting State v. Patterson, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). Said differently, constructive possession is the "ability to reduce an object to actual possession." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). The Defendant does not dispute that he had possession of the firearms. The proof was sufficient to establish that the Defendant had possession of the weapons.

Additionally, "the State had to show that the Defendant possessed the firearm and that he acted recklessly, knowingly, or intentionally." State v. Kentrel N'Air Siner, No. W2020-01719-CCA-R3-CD, 2022 WL 252354, at *5 (Tenn. Crim. App. Jan. 27, 2022) (citing Tenn. Code Ann. § 39-11-301(c)). Tennessee Code Annotated section 39-11-302 provides:

> (a) "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
> (b) "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.
> (c) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(a)-(c).

The Defendant contends that he did not have the requisite intent to commit the crimes because he did not know the firearms were in his vehicle. However, the proof adduced at trial reflected that months prior to the traffic stop, the Defendant was photographed standing beside two guns, one of which was the stolen Taurus nine-millimeter handgun

that was found in the Defendant's vehicle. During the stop, the police found two handguns in a backpack that was in the backseat of the Defendant's vehicle. The backpack was located within "arm's reach" of the Defendant. The backpack was partially unzipped. Additionally, once the search of the vehicle was commenced, the Defendant ran from the scene. See Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979) ("Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court."). We conclude that the foregoing was sufficient to establish that the Defendant had the sufficient mental state to possess the firearms.

## **CONCLUSION**

Based upon the above reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE